IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| STACY JO WHITAKER, | ) CASE NO.  3:22-CV-00922-JJH |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) JUDGE  JEFFREY J. HELMICK |
| vs. | ) UNITED STATES DISTRICT JUDGE |
| | ) |
| COMMISSIONER OF SOCIAL | ) MAGISTRATE JUDGE |
| SECURITY, | ) JONATHAN D. GREENBERG |
| | ) |
| Defendant. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| | ) |

Plaintiff, Stacy Jo Whitaker ("Plaintiff" or "Whitaker"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED AND REMANDED for further proceedings consistent with this opinion.

## I.   PROCEDURAL HISTORY

In April 2020, Whitaker filed an application for POD and DIB, alleging a disability onset date of January 30, 2017[2] and claiming she was disabled due to bipolar disorder, depression, anxiety, osteoarthritis, spinal disorder, fibromyalgia, sleep disorder, ADHD, trouble concentrating, and inability to

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.
[2] At the hearing, Whitaker amended her alleged onset date to January 3, 2019.  (Transcript ("Tr.") 39-40.)

focus.  (Transcript ("Tr.") 15, 102.)  The application was denied initially and upon reconsideration, and Whitaker requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On April 14, 2021, an ALJ held a hearing, during which Whitaker, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On April 26, 2021, the ALJ issued a written decision finding Whitaker was not disabled.  (*Id.* at 15-26.)  The ALJ's decision became final on April 11, 2022, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On June 2, 2022, Whitaker filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7-9.)  Whitaker asserts the following assignments of error:

(1)    The ALJ's RFC finding is legally insufficient and unsupported by substantial evidence as it is inconsistent with opinion evidence and the record as a whole, and in making such finding, opinion evidence was not evaluated in accordance with the regulations and the ALJ made impermissible lay interpretations of the medical evidence.

(2)    The ALJ improperly evaluated the intensity, persistence and functionally limiting effects of Claimant's symptoms.

(Doc. No. 7.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Whitaker was born in June 1976 and was 45 years-old at the time of her administrative hearing (Tr. 15, 24), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c).  She has at least a high school education and is able to communicate in English.  (Tr. 24.)  She has past relevant work as a dental assistant.  (*Id.*)

B. **Medical Evidence**[3]

On January 16, 2019, Whitaker saw treating psychiatrist George Williams, M.D., for follow up. (*Id.* at 1081-87.) Whitaker reported she had not been doing well. (*Id.* at 1081.) Whitaker told Dr. Williams she had been tested for ADHD by her psychologist and was told to discuss this with Dr. Williams. (*Id.*) Whitaker endorsed a depressed mood, poor motivation, poor energy, poor initiative, poor focus and concentration, and poor persistence. (*Id.* at 1082.) Dr. Williams indicated Whitaker had brought the paperwork regarding her ADHD testing with her. (*Id.*) Whitaker reported she had been denied disability benefits and was in the process of appealing that decision. (*Id.*) Dr. Williams noted Whitaker's attorney requested documentation regarding Whitaker's inability to work given her current medical and psychiatric disorders. (*Id.*) On examination, Dr. Williams found normal muscle strength, normal gait, full orientation, fair grooming and hygiene, good eye contact, cooperative/pleasant behavior, normal speech, dysphoric and anxious mood, blunted affect, logical thought processes, intact memory and recall, average intelligence, and good insight and judgment. (*Id.* at 1084.) Dr. Williams noted Whitaker seemed "more anxious, tenuous and withdrawn today." (*Id.*) Dr. Williams added a trial of Adderall to address Whitaker's ADHD symptoms. (*Id.* at 1085.) Dr. Williams continued Whitaker's other medications as Whitaker found them "helpful and well tolerated." (*Id.*)

On February 8, 2019, Whitaker saw Dr. Williams for follow up. (*Id.* at 1088.) Whitaker reported the Adderall had helped and she felt like it was making a difference. (*Id.*) Whitaker believed she might benefit from a slightly higher dose of Adderall. (*Id.* at 1089.) On examination, Dr. Williams found normal muscle strength, normal gait, full orientation, fair grooming and hygiene, good eye contact, cooperative/pleasant behavior, normal speech, euthymic mood, broad affect, logical thought processes, intact memory and recall, average intelligence, and good insight and judgment. (*Id.* at 1091.) Dr.

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

Williams increased Whitaker's Adderall dosage and noted he would complete the appeal letter for disability Whitaker had requested. (*Id.* at 1092.)

On March 28, 2019, Whitaker and her husband met with Latasha Foster, QMHS. (*Id.* at 1095-96.) Whitaker and her husband told Foster they were angry with Dr. Williams and his assistant because Whitaker had been waiting for a letter from Dr. Williams for her disability appeal and she was getting frustrated. (*Id.* at 1095.) Foster went to talk to Dr. Williams and his assistant, and Dr. Williams came in to see Whitaker and tell her he would have a letter for her soon. (*Id.*) Foster noted a pleasant but agitated mood, unremarkable thought process/orientation, and unremarkable behavior/functioning. (*Id.*)

That same day, Dr. Williams wrote a letter in support of Whitaker's appeal of her denial of benefits, stating he had treated Whitaker since April 2017 for major depression, recurrent, and unspecified anxiety disorder. (*Id.* at 343.) Dr. Williams challenged the ALJ's interpretation of his treatment records from 2017 and 2018 in the decision denying benefits. (*Id.*) Dr. Williams then stated:

> It is my opinion with reasonable degree of medical and psychiatric certainty that Ms. Whitaker is indeed disabled based on multiple etiologies both physical and mental. Her ongoing issues with depression show little resolution despite multiple trials of a wide variety of psychotropic medications within the mood stabilizing and antidepressant class although not limited to them. I believe that her long-term prognosis is unlikely to change much based on current evidence available from a multidisciplinary evaluation and management of mental and physical symptoms.

(*Id.* at 344.)

On April 3, 2019, Whitaker saw Dr. Williams for follow up. (*Id.* at 1097.) Whitaker reported she had "'been doing alright overall,'" although she felt like on occasion Wellbutrin XL would "'go right through [her].'" (*Id.*) Otherwise, Whitaker told Dr. Williams her medications were helpful and well-tolerated, and she did not want to change her medication. (*Id.* at 1098.) On examination, Dr. Williams found normal muscle strength, normal gait, full orientation, fair grooming and hygiene, good eye contact, cooperative/pleasant behavior, normal speech, euthymic mood, broad affect, logical thought processes,

4

intact memory and recall, average intelligence, and good insight and judgment.  (*Id.* at 1100-01.)  Dr. Williams switched Whitaker from Wellbutrin XL to Wellbutrin SR.  (*Id.* at 1102.)

On May 7, 2019, Whitaker saw Kelly Buckles, NP, for follow up and medication refills.  (*Id.* at 868.)  On examination, Buckles found "erect, stable and coordinated" gait and posture, although Whitaker complained of pain to palpation of the bilateral lower legs and lumbar region and constant muscle pain.  (*Id.* at 868-69.)  Buckles noted Whitaker was "very anxious" during the appointment and that Whitaker reported she did not like to leave her house and she had constant anxiety, although Whitaker felt her depression was mostly controlled on her current medications.  (*Id.* at 869.)  Buckles recommended Whitaker follow up with Psych and discuss her increased anxiety.  (*Id.*)  Buckles noted she again offered pain management, which Whitaker declined, as it did not help and increased her anxiety.  (*Id.*)  Buckles discussed the need for Whitaker to try and increase her physical activity and include gentle exercise and stretching.  (*Id.*)

On May 8, 2019, Whitaker saw Dr. Williams for follow up and reported she had "'been doing fairly good lately.'"  (*Id.* at 1105.)  Whitaker told Dr. Williams she had been taking and tolerating her medication well and was not looking for a medication change at that time.  (*Id.* at 1106.)  On examination, Dr. Williams found normal muscle strength, normal gait, full orientation, fair grooming and hygiene, good eye contact, cooperative/pleasant behavior, normal speech, euthymic mood, broad affect, logical thought processes, intact memory and recall, average intelligence, and good insight and judgment.  (*Id.* at 1108-09.)

Spinal x-rays taken on June 28, 2019, revealed "[a] few millimeters anterior subluxation of L5 on S1 associated with significant degenerative changes of L5-S1 facet joints."  (*Id.* at 876.)

On July 16, 2019, David Szymanski, M.D., reported that EMG testing revealed "[m]oderate left-sided carpal tunnel syndrome affecting both motor and sensory fibers." (*Id.* at 873-74.)  Dr. Szymanski noted that "[n]o underlying cervical radiculopathy was seen." (*Id.* at 873.)

On August 20, 2019, Whitaker saw David Beeks, M.D., an orthopedic surgeon, for evaluation of her chronic back pain. (*Id.* at 402.)  Whitaker reported constant back pain that had been continuing to worsen. (*Id.*)  Whitaker described the pain as constant, aching, and severe, and reported the pain was aggravated by standing and bending. (*Id.*)  Whitaker complained of all day stiffness and associated numbness, tingling, and paresthesias. (*Id.*)  Analgesics and NSAIDS provided no relief from the pain, nor did Percocet. (*Id.* at 402-03.)  Whitaker occasionally used heat, ice, and a massager to relieve the pain. (*Id.* at 403.)  Whitaker told Dr. Beeks the pain was worse at night, interrupted her sleep, and prevented her from sleeping. (*Id.*)  On examination, Dr. Beeks found normal strength, no sensory deficits, normal muscle tone, normal coordination, and normal gait. (*Id.*)  Dr. Beeks ordered an MRI and physical therapy. (*Id.* at 404.)

On August 29, 2019, Whitaker underwent a mental health assessment with Aimee Whitmer, LSW. (*Id.* at 778, 783.)  Whitaker reported she was "decent" on her medication, but she did not go anywhere, and she had multiple past suicide attempts. (*Id.* at 778.)  Whitaker told Whitmer her depression came in waves, and she would have no energy and stay in bed all day. (*Id.*)  Whitaker reported sleeping 14 hours a day with occasional naps, and endorsed a lack of motivation, lack of focus, lack of energy, sadness, occasional hopelessness, and lethargy. (*Id.*)  Whitaker described her anxiety symptoms as fear, worry, and anxiousness, with racing heart and racing thoughts. (*Id.*)  She did not like to go anywhere, she did not like large groups of people, and she would not drive. (*Id.*)  She did not sleep well at night when anxious. (*Id.*)  Loud and strange noises bothered her. (*Id.*)  Whitaker endorsed having "no concentration" and bouncing from one task to another. (*Id.*)  She could not focus and became nervous answering questions. (*Id.*)

6

Whitaker told Whitmer she could not pay attention to details, and she could not watch movies. (*Id.*) Whitaker avoided doing tasks if she knew it would take a lot of concentration. (*Id.*) On examination, Whitmer found neat appearance, normal speech, normal eye contact, normal motor activity, full affect, euthymic mood, memory impairment, average intelligence, distracted attention, no delusions, cooperative behavior, no suicidal or homicidal thoughts, and good insight and judgment. (*Id.* at 780-81.) Whitmer diagnosed Whitaker with alcohol dependence, in remission, unspecific anxiety disorder, and major depressive disorder, recurrent episode. (*Id.* at 782.)

On October 25, 2019, during a mental health nursing services visit, Whitaker reported "stability" on her current medication, but she had no insurance at the time, and she wanted to discuss either cutting back on some of her medications or substituting some of them for cheaper medications. (*Id.* at 789-90.) Whitaker told the nurse her appetite was good, she slept well, and she walked for exercise. (*Id.* at 790.) Whitaker denied any thoughts of self-harm. (*Id.*)

On October 30, 2019, Whitaker saw Daniel Lau, CNP, for mental health evaluation and management. (*Id.* at 361, 366.) Whitaker reported sleeping less than six hours a night without daytime fatigue and denied medication side effects. (*Id.* at 361.) On examination, Lau found fluent speech, spontaneous, logical, and goal-directed thought processes, normal associations, good judgment and insight, full orientation, normal attention/concentration, intact memory, stable and euthymic mood, and an affect that was broad and appropriate to her mood. (*Id.* at 363-64.)

During an initial therapy session to establish care on May 19, 2020, Whitaker reported having problems at home but that she had a good relationship with her husband, and she liked her parents and grown stepchildren. (*Id.* at 819-20.) Whitaker wanted to improve her relationship with her stepchildren. (*Id.* at 820.) Whitaker reported "she was not forthcoming with the Dr. about her level of depression," so

her therapist "e-mailed the Dr. to check with her on medication dosage since she said she was more depressed than she reported at her apt." (*Id.*)

On May 21, 2020, Whitaker saw NP Buckles for follow up. (*Id.* at 852.) Whitaker complained of a rash on her upper back, bilateral lumbar pain that radiated down her left leg, numbness in her left buttock after sitting for long periods of time, increased fibromyalgia pain, and increased anxiety. (*Id.* at 853.) On examination, Buckles found tenderness to palpation of the lower abdomen, myofascial discomfort in the upper shoulders, tenderness to palpation of the low back, abnormal gait, full orientation, cooperative behavior, good eye contact, full range of mood/affect, clear speech, and no suicidal ideation or delusions. (*Id.* at 853-54.)

MRI imaging of the lumbar spine taken on June 8, 2020, revealed "[a]nnular tears at the L3-4 and the L4-5 level . . . with moderate bilateral neural foraminal narrowing and mild narrowing of the central canal," "[m]inimal anterolisthesis of L5 on S1," "[n]o significant neural foraminal encroachment or central canal stenosis," and "[d]isc desiccation at the L3-4 through the L5-S1 level." (*Id.* at 775-76.)

On July 12, 2020, Whitaker completed an adult function report. (*Id.* at 265-72.) Whitaker reported her mental condition, depression, and anxiety limited her ability to interact with others outside of her immediate family. (*Id.* at 265.) Her back pain limited her ability to care for herself. (*Id.*) She was afraid to drive a car safely. (*Id.*) Whitaker reported she had "a very hard time focusing and remembering things." (*Id.*) Whitaker spent her days drinking coffee, sitting and watching TV, and talking to her mom and husband. (*Id.* at 266.) Whitaker showered in the late afternoon and her mom came to visit and help her. (*Id.*) Whitaker's mom and mother-in-law helped her and her husband with chores and meals. (*Id.*) Whitaker needed help getting in and out of the shower and remembering to take her medications, and she had a hard time remembering what she was doing. (*Id.* at 266-67.) She did not prepare meals because she forgets what she is doing. (*Id.* at 267.) She could do light dish washing or laundry but standing for a long

time hurt too much.  (*Id.*)  Whitaker reported being afraid of being alone and felt she could not safely drive because of her trouble focusing.  (*Id.* at 268.)  She went to the grocery store once or twice a month with her husband.  (*Id.*)  Whitaker could pay bills, handle a savings account, and use a checkbook or money orders, but she could not count change.  (*Id.*)  Whitaker reported she did not get along with her brother and did not have any friends.  (*Id.* at 270.)  She had a hard time standing for too long or lifting more than 10 pounds.  (*Id.*)  She could squat but she needed help getting up.  (*Id.*)  She could walk a city block before needing to rest for five to ten minutes.  (*Id.*)  She had a hard time following written instructions, but she could do it if she could ask questions.  (*Id.*)  She did not follow spoken instructions well as she forgets what she is told.  (*Id.*)  Whitaker reported not handling stress well and crying, and changes in her routine made her nervous and upset.  (*Id.* at 271.)  She saw a counselor once a week and a psychiatrist once every three months.  (*Id.* at 272.)

On August 4, 2020, Whitaker saw Georges Jabaly, M.D., to establish care.  (*Id.* at 1185.)  On examination, Dr. Jabaly found normal range of motion and depressed mood.  (*Id.* at 1187.)

On August 10, 2020, Whitaker saw Dr. Jabaly for a suboxone appointment.  (*Id.* at 919.)  On examination, Dr. Jabaly found normal range of motion, tremor, anxious and depressed mood, agitated behavior, and normal thought content.  (*Id.* at 921.) Dr. Jabaly diagnosed Whitaker with opiate abuse and determined Whitaker wanted and needed opioid replacement therapy.  (*Id.*)

On September 1, 2020, Whitaker saw Dr. Beeks for follow up of her back pain.  (*Id.* at 1276.)  Whitaker complained of "significant aggravated shin of [sic] pain when she ha[d] to forward flex" and reported no benefit from physical therapy.  (*Id.*)  On examination, Dr. Beeks found normal gait.  (*Id.* at 1277.)  Dr. Beeks diagnosed Whitaker with lumbar radicular pain and chronic midline low back pain with right-sided sciatica.  (*Id.* at 1278.)  Dr. Beeks recommended lumbar epidural steroid injections.  (*Id.*)

9

On September 24, 2020, Whitaker met with Jeanene Melquist, LPC, to establish medication management with Dr. Jahn after Dr. Williams retired.  (*Id.* at 1115, 1123.)  Whitaker reported having "severe depression and severe anxiety" since she was 16.  (*Id.* at 1115.)  Whitaker told Melquist she had been on different medications over the years, and while her current regimen was "'holding [her] steady,'" she still had anxiety and she still was not the person she wanted to be, although it was at least manageable. (*Id.*)  Whitaker reported generalized and social anxiety, told Melquist she worried about everything all the time, and stated she stayed home a lot because of social anxiety.  (*Id.*)  Whitaker's primary care physician had taken her off Adderall and Whitaker endorsed ADHD symptoms when not on medication.  (*Id.*) Whitaker told Melquist she had no abilities, interests, or skills, and she could not identify any strengths. (*Id.* at 1117.)  On examination, Melquist found full orientation, normal speech, euthymic mood, broad affect, logical thought processes, intact memory and recall, average intelligence, and good insight and judgment.  (*Id.* at 1116-17.)  Melquist diagnosed Whitaker with persistent depressive disorder (dysthymia), generalized anxiety disorder, social anxiety disorder (social phobia), and ADHD, predominantly inattentive presentation.  (*Id.* at 1123.)

On September 25, 2020, Whitaker saw Shirley Vogelsong, QMHS, to discuss Whitaker's insurance status and applying for Medicaid.  (*Id.* at 1127-28.)  Vogelson noted Whitaker had an anxious mood/affect, was "[e]asily overwhelmed and confused," and had requested assistance with benefits.  (*Id.* at 1127.)

On October 19, 2020, Whitaker saw Kiran Chary Tamirisa, M.D., for a pain management evaluation.  (*Id.* at 1243.)  On examination, Dr. Tamirisa found no edema, intact sensation, normal motor function, diminished Achilles reflexes, normal muscle strength, lumbar and sacroiliac tenderness, limited range of motion of the back, positive straight leg raise tests bilaterally, antalgic gait, paraspinal tenderness, and increased lumbar lordosis.  (*Id.* at 1246-49.)  Dr. Tamirisa diagnosed Whitaker with lumbar

10

radiculopathy, lumbar degenerative disc disease, and lumbar adjacent segment disease with spondylolisthesis.  (*Id.* at 1250.)  Dr. Tamirisa recommended lumbar epidural steroid injections at L4-L5 and spine strengthening exercises.  (*Id.* at 1250-51.)

On November 18, 2020, Whitaker talked to Vogelsong about issues with Medicaid.  (*Id.* at 1304.) Vogelsong again noted Whitaker had an anxious mood/affect, was "[e]asily overwhelmed and confused," and had requested assistance with benefits.  (*Id.*)

On December 1, 2020, Whitaker saw David Jahn, M.D., for medication management.  (*Id.* at 1306.)  Dr. Jahn noted a "long-standing history" of difficulties with depression, anxiety, and limited focus and concentration.  (*Id.*)  While Whitaker reported benefits from Adderall, she had to discontinue it to be put on Suboxone.  (*Id.*)  Whitaker endorsed depression symptoms including decreased interest, energy, and concentration, and she was often tearful and overwhelmed.  (*Id.*)  On examination, Dr. Jahn found normal muscle strength, normal gait, full orientation, good grooming/hygiene, good eye contact, cooperative/pleasant behavior, normal speech, a dysphoric and anxious mood, broad affect, logical but preoccupied thought process, limited focus, concentration, and short-term memory, average intelligence, and fair judgment and insight.  (*Id.* at 1311-12.)  Dr. Jahn started Whitaker on atomoxetine, decreased Cymbalta, and continued Whitaker's other medications.  (*Id.* at 1313.)

That same day, Whitaker saw Dr. Tamirisa for follow up of her back pain.  (*Id.* at 1266.)  Whitaker had undergone lumbar facet joint injections on the left on November 17, 2020.  (*Id.*)  Whitaker reported a 30% improvement in her pain, although she was still having some pain in her left lower back.  (*Id.*)  Dr. Tamirisa noted Whitaker was "doing well with good pain relief after the last procedure," she was "able to increase the activity levels," she did "not complain [of] much pain and [was] overall satisfied with the pain relief."  (*Id.* at 1272.)  Dr. Tamirisa stated, "As patient is doing well at this time no further interventions are needed."  (*Id.*)

On December 31, 2020, Whitaker saw Dr. Jahn for follow up. (*Id.* at 1326.) Whitaker reported she had been unable to start atomoxetine until now as her insurance did not cover it until December 29, 2020. (*Id.*) Whitaker endorsed continued difficulties with depression, anxiety, and limited focus and concentration, as well as numerous medical issues. (*Id.*) Whitaker reported she had a lot of anxiety when around groups of people; when around others, she withdraws, she cannot "'think straight,'" and her mind "'goes blank.'" (*Id.*) On examination, Dr. Jahn found normal muscle strength, normal gait, full orientation, good grooming/hygiene, good eye contact, cooperative/pleasant behavior, normal speech, a dysphoric and anxious mood, broad affect, logical but preoccupied thought process, continued limited focus, concentration, and short-term memory, average intelligence, and fair judgment and insight. (*Id.* at 1331-32.)

On January 5, 2021, Whitaker saw Dr. Jabaly for follow up of her chronic fatigue and back pain. (*Id.* at 1375-77.) Whitaker reported continued constant fatigue with no energy and associated symptoms of arthralgias, myalgias, and a rash on her back. (*Id.* at 1377.) Rest did not help her symptoms. (*Id.*) Whitaker also reported continued aching gluteal and lumbar pain that radiated to her right knee. (*Id.*) Whitaker rated her pain as a 7/10 and told Dr. Jabaly changing positions provided mild relief. (*Id.*) On examination, Dr. Jabaly found decreased range of motion, tenderness, pain, and spasm of the lumbar region. (*Id.* at 1380.) Dr. Jabaly prescribed levothyroxine for hypothyroidism and tizanidine for spinal stenosis of the lumbar region. (*Id.* at 1381.)

On January 14, 2021, Whitaker saw LPC Melquist for follow up and reported feeling stressed. (*Id.* at 1337.) On examination, Melquist found a stable mood but tearful affect at times, unremarkable thought process/orientation, and unremarkable behavior/functioning. (*Id.* at 1338.) Melquist noted some improvement. (*Id.*)

On January 15, 2021, Whitaker saw Dr. Jabaly for follow up of her chronic pain, back pain, and anxiety.  (*Id.* at 1390-91.)  Whitaker complained of waxing and waning stabbing and aching pain in the lumbar, sacroiliac, and gluteal regions that radiated to her right knee.  (*Id.* at 1392.)  Whitaker rated her pain as a 7/10 and reported it was worse at night and aggravated by lying down, bending, standing, and sitting.  (*Id.*)  Whitaker also complained of all day stiffness.  (*Id.*)  Whitaker told Dr. Jabaly treatment provided mild relief.  (*Id.*)  On examination, Dr. Jabaly found decreased range of motion, tenderness, pain, and spasm of the lumbar region, as well as multiple trigger points in the upper and lower extremities.  (*Id.* at 1395.)

On January 19, 2021, Whitaker saw Dr. Beeks for follow up.  (*Id.* at 1284.)  Whitaker reported she had undergone a series of epidural steroid injections with no improvement.  (*Id.*)  On examination, Dr. Beeks found normal gait.  (*Id.* at 1285.)  Dr. Beeks noted Whitaker had failed conservative measures and was a candidate for surgery, but she needed to quit smoking.  (*Id.* at 1286.)

On January 29, 2021, Dr. Jabaly completed a Physical Medical Source Statement.  (*Id.* at 1293-97.)  Whitaker's diagnoses included spondylolisthesis, lumbar spinal stenosis, chronic fatigue syndrome, chronic pain syndrome, inflammatory arthritis, depression, and anxiety.  (*Id.* at 1293.)  Dr. Jabaly listed Whitaker's prognoses as guarded.  (*Id.*)  Whitaker's symptoms included pain, fatigue, tingling, back pain, and myalgias.  (*Id.*)  Whitaker's pain included lower back pain, generalized trigger points, left wrist pain, and multiple joint pain.  (*Id.*)  Dr. Jabaly reported Whitaker's pain was aggravated by palpation and active or passive range of motion.  (*Id.*)  Whitaker's treatments included anti-inflammatories, chronic opiates, muscle relaxers, and a pain modulator.  (*Id.*)  Dr. Jabaly opined that "due to severe fatigue and pain, patient is unable to go through a Functional Capacity Evaluation."  (*Id.* at 1294.)

On February 2, 2021, Whitaker met with LPC Melquist for follow up.  (*Id.* at 1340.)  On examination, Melquist found stable mood, unremarkable thought process/orientation, and unremarkable behavior/functioning.  (*Id.*)  Melquist noted some improvement.  (*Id.* at 1341.)

On February 8, 2021, Whitaker saw Dr. Jahn for follow up.  (*Id.* at 1342.)  Whitaker reported continuing "significant difficulty" with depression, anxiety, limited focus, concentration, and short-term memory, chronic pain, and insomnia.  (*Id.*)  Whitaker told Dr. Jahn she felt worthless and overwhelmed.  (*Id.*)  Dr. Jahn noted a tearful affect.  (*Id.*)  Whitaker reported continued anxiety attacks triggered by stressors such as being in a different environment, driving, being alone, etc.  (*Id.*)  During these anxiety attacks, Whitaker experienced chest pressure, chest pain, and difficulty breathing.  (*Id.*)  Whitaker told Dr. Jahn she was worried about many things, including fear of her family members' health, and she was anxious and scared when alone.  (*Id.*)  Dr. Jahn noted Whitaker was on a "complex" medication regimen and Whitaker did not want to make any medication changes because she was afraid her symptoms would worsen, or she would experience side effects.  (*Id.*)  On examination, Dr. Jahn found Whitaker restless with normal language and speech, a sad and anxious mood, a dysphoric and anxious affect, poor concentration and attention span, preoccupation with anxiety/worry, full orientation, fair insight and judgment, impaired immediate and recent memory, and fair remote memory.  (*Id.* at 1345-47.)  Dr. Jahn noted Whitaker could recall one of out three words in five minutes and that Whitaker was "[q]uite forgetful at least in part due to limited focus and concentration."  (*Id.* at 1347.)  Whitaker also reported intermittent thoughts that she would be better off dead, but she did not want to consider hospitalization and she told Dr. Jahn she would keep herself safe.  (*Id.*)

On February 10, 2021, Dr. Jahn completed a Mental Medical Source Statement.  (*Id.* at 1298-1303.)  Whitaker's mental diagnoses consisted of persistent depressive disorder (dysthymia), major depressive disorder, recurrent, severe, generalized anxiety disorder, social anxiety disorder, and ADHD.

14

(*Id.* at 1298.)  Dr. Jahn listed the following clinical findings demonstrating the severity of Whitaker's mental impairments and symptoms: "[p]oor focus, concentration [and] memory, easily tearful, depressed mood, feelings of worthlessness, hopelessness, limited energy, interest level[,] [p]oor sleep[,] [q]uite anxious[,] [h]ad thoughts of suicide[,] [f]eeling others would be better off without her." (*Id.*)  Dr. Jahn listed Whitaker's prognosis as poor.  (*Id.*)  Dr. Jahn opined Whitaker would be unable to meet competitive standards in the following areas: maintain attention for two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in a routine work setting.  (*Id.* at 1300.)  Dr. Jahn further opined Whitaker had no useful ability to function in her abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and deal with normal work stress.  (*Id.*)  Dr. Jahn explained the basis for the opined limitations as follows:

> Patient's symptomatology is of such severity that she would be unable to complete even 1 "normal workday" without psychologically based sx's. Would become overwhelmed, tearful, could not handle even mild stress, would become severely anxious + depressed, stress would worsen focus, concentration, short term memory, etc. Constructive criticism from supervisors would reinforce her feelings of worthlessness + hopelessness.

(*Id.*)

Dr. Jahn opined Whitaker would be unable to meet competitive standards in her abilities to understand and remember detailed instructions and deal with the stress of semiskilled and skilled work. (*Id.* at 1301.)  Dr. Jahn explained the basis for the opined limitations as follows: "Patient unable to deal with any stress due to the severity of her depression and anxiety." (*Id.*)  Dr. Jahn further opined Whitaker would be unable to meet competitive standards in her ability to travel in an unfamiliar place and had no useful ability to function in her ability to use public transportation. (*Id.*)  Dr. Jahn explained the basis for

15

the opined limitations as follows: "Difficulties with focus, concentration, short term memory, lack of self esteem and fears would severely impact any ability to use public transportation or to travel in unfamiliar places." (*Id.*)

Dr. Jahn determined Whitaker had marked limitations in her abilities to remember information, apply information, interact with others, concentrate, persist, and manage herself in the workplace. (*Id.* at 1302.)  Dr. Jahn found Whitaker had an extreme limitation in her ability to adapt in the workplace. (*Id.*) Dr. Jahn opined Whitaker would miss more than four days per month of work because of her impairments and that she could not manage benefits in her own best interest. (*Id.* at 1302-03.)

On February 25, 2021, Whitaker saw Dr. Jahn for follow up. (*Id.* at 1426.)  Whitaker reported continued chronic pain, depression, anxiety, and limited focus, concentration, and anxiety. (*Id.*) Whitaker's doctor, Dr. Jabaly, had Whitaker ask about Dr. Jahn prescribing amitriptyline and weaning Whitaker off of up to three medications. (*Id.*)  Dr. Jahn told Whitaker he would talk to Dr. Jabaly about this. (*Id.*)  In the meantime, Dr. Jahn would increase Whitaker's dosage of atomoxetine to the highest dosage. (*Id.*)  On examination, Dr. Jahn found Whitaker restless with normal language and speech, a sad and anxious mood, a dysphoric and anxious affect, poor concentration and attention span, preoccupation with anxiety/worry, full orientation, fair insight and judgment, impaired immediate and recent memory, and fair remote memory. (*Id.* at 1429-31.)  Dr. Jahn again noted Whitaker could recall one of out three words in five minutes and that Whitaker was "[q]uite forgetful at least in part due to limited focus and concentration." (*Id.* at 1431.)

On March 23, 2021, Whitaker saw LPC Melquist for follow up. (*Id.* at 1440.)  Whitaker reported feeling depressed, anxious, and lonely throughout the day, and she could not identify a time when she felt better. (*Id.*)  On examination, Melquist found stable mood, unremarkable thought process/orientation, and unremarkable behavior/functioning. (*Id.*)

## C. State Agency Reports

### 1. Mental Impairments

On August 6, 2020, Cynthia Waggoner, Psy.D., reviewed the file and adopted the ALJ's PRT and mental RFC under AR 98-4. (*Id.* at 106, 108.)

On December 7, 2020, on reconsideration, Todd Finnerty, Psy.D., affirmed Dr. Waggoner's findings. (*Id.* at 114-15, 118.)

### 2. Physical Impairments

On September 17, 2020, Gerald Klyop, M.D., reviewed the file and adopted the ALJ's physical RFC under AR 98-4. (*Id.* at 107.)

On December 7, 2020, on reconsideration, Mehr Siddiqui, M.D., did not affirm Dr. Klyop's findings because Whitaker had been diagnosed with spondylosis of the lumbar spine without radiculopathy. (*Id.* at 117.) Dr. Siddiqui opined Whitaker could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and her ability to push and/or pull was unlimited, other than shown for lift and/or carry. (*Id.* at 116.) Whitaker could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (*Id.*) Whitaker could frequently climb ramps/stairs but never climb ladders, ropes, or scaffolds. (*Id.*) Whitaker could frequently balance and occasionally stoop, kneel, crouch, and crawl. (*Id.*) Whitaker must avoid all exposure to hazards. (*Id.* at 117.)

## D. Hearing Testimony

During the April 14, 2021, hearing, Whitaker testified to the following:

- She lives with her husband. (*Id.* at 40.) She holds a driver's license, but she only drives about four miles. (*Id.* at 41.) Her mental illness, fibromyalgia, and lower back pain prevent her from working. (*Id.* at 41-42.)

- She can walk one to two blocks before needing to rest. (*Id.* at 42.) She can stand for 10-15 minutes. (*Id.*) She can bend at the waist, but not very far. (*Id.*) She can squat

17

with discomfort.  (*Id.*)  She is limited to lifting 8-15 pounds.  (*Id.*)  She has problems using her hands because of carpal tunnel syndrome.  (*Id.* at 43.)  Her hands go numb if she uses them too much and her wrists and joints hurt from her fibromyalgia.  (*Id.*)  She has not yet had surgery for carpal tunnel syndrome.  (*Id.*)  She can sit for 10-15 minutes before needing to move around; otherwise, her legs go numb, and her lower back starts to hurt.  (*Id.*)

- She smokes about a half pack of cigarettes a day.  (*Id.*)  She last had alcohol three days ago.  (*Id.*)  She has been on a Suboxone program for opioid abuse, and she has to go to meetings and take urine tests.  (*Id.* at 44.)

- She gets three "good hours" of sleep a night because she tosses and turns from discomfort, her hands and arms go numb, and her back hurts.  (*Id.*)  She goes and lays on the couch at 5:00 a.m. because she cannot stand being in bed any longer.  (*Id.*)

- She continues to have memory problems.  (*Id.* at 45.)  She underreported her depression to Dr. Williams, her psychiatrist, in October 2019 because if she did, he would just prescribe more medication and she takes a lot already.  (*Id.* at 45-46.)  She does not socialize well.  (*Id.* at 47.)  She has issues with her brother, which causes her daily stress.  (*Id.*)  She gets anxious almost to the point of having panic attacks when she is alone, so she has to have somebody with her.  (*Id.* at 49.)  She cannot count change because of "fibro fog" and anxiety about having to do it, so she gets it wrong.  (*Id.*)  She forgets what she is going to do or say.  (*Id.*)  She attempted suicide in the last few years, and occasionally has suicidal thoughts.  (*Id.* at 51.)  She sees her psychiatrist every five to six weeks and her counselor every two weeks.  (*Id.* at 51-52.)  She stays in her pajamas all day five out of seven days.  (*Id.* at 52.)  She is not interested in anything.  (*Id.*)  She cannot read anymore because she cannot focus.  (*Id.* at 53.)  She does not have good concentration with anything.  (*Id.*)  She has trouble finishing what she starts.  (*Id.*)  She has coloring books that are supposed to help, but when she tries to do them, her wrists start hurting.  (*Id.*)  She gets confused and overwhelmed often, and she does not handle stress well.  (*Id.*)  She gets frustrated and stressed because she cannot do things.  (*Id.* at 55.)  Anything that happens within her family stresses her out.  (*Id.*)  She cries a few times a week.  (*Id.*)

- Her lower back hurts and causes a shooting pain down her right leg to her knee.  (*Id.* at 53.)  The pain is aching and causes tingling.  (*Id.*)  Sometimes she cannot walk well.  (*Id.*)  Sitting for too long, standing for too long, and climbing steps make the pain worse.  (*Id.* at 54.)  Sometimes her right knee will give out on her.  (*Id.*)  Steroid injections provided relief for a few days before wearing off.  (*Id.*)  She uses a heating pad and ice to try and alleviate the pain.  (*Id.*)  She is thinking about getting injections again to see if they help.  (*Id.*)

- Her husband helps her.  (*Id.* at 47.)  He cooks and does the laundry.  (*Id.*)  She does what she can around the house before she needs to rest for 10-15 minutes before trying to continue to do what she can.  (*Id.*)  Her husband helps her in and out of the shower because the tub is high.  (*Id.* at 48.)

18

- She spends her days sitting around and laying on the couch. (*Id.* at 47.) She calls her mom a few times a day because her mom comforts her. (*Id.*) She does what she can around the house, which is limited. (*Id.*) She naps several times a day. (*Id.* at 48.) She occasionally looks through Craigslist on the computer but using the mouse for too long hurts her wrist. (*Id.*) She watches Chicago Med on television because she does not have to focus on it. (*Id.* at 55-56.) She goes to church on occasion. (*Id.* at 56.) She does not belong to any organizations. (*Id.*)

- Her medications make her dizzy and very tired. (*Id.* at 52.)

The ALJ posed the following hypothetical question:

> [A]ssume that a hypothetical individual of the Claimant's age, education, and work experience has the residual functional capacity for work at the light exertional level; postural limitations of no climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; frequent balancing; occasional stooping, kneeling, crouching, and crawling; occasional use of the bilateral lower extremities for operation of foot controls; manipulative limitation of occasional use of the left, upper extremity for handling and fingering; frequent use of the right, upper extremity for reaching, handling, and fingering; environmental limitation to avoid all exposure to hazards, such as dangerous, moving machinery and unprotected heights; work limited to well-explained, simple, routine, and repetitive tasks, in a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belts; involving only work-related decisions with few, if any, workplace changes; no interaction with the general public; occasional interaction with co-workers and supervisors. Ms. Frailey, would a hypothetical individual with that residual functional capacity be able to perform the past relevant work of dental assistant?

(*Id.* at 58-59.)

The VE testified the hypothetical individual would not be able to perform Whitaker's past work as a dental assistant. (*Id.* at 59.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as housekeeping cleaner, merchandise marker, and inspector, hand packager. (*Id.* at 59-60.)

The ALJ changed the exertional level to sedentary, and the VE testified the hypothetical individual could perform representative jobs in the economy, such as addresser, document preparer, and cutter and paster. (*Id.* at 60.)

In response to additional questioning from the ALJ, the VE testified that a sit/stand option of alternating positions for one to two minutes in the immediate vicinity of the work station every 30 minutes was work preclusive, as were two additional 15 minute breaks, absences more than four days a month, and time off-task more than 25% of the work period.  (*Id.* at 61.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is

presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Whitaker was insured on her alleged disability onset date, January 3, 2019, and remained insured through September 30, 2021, her date last insured ("DLI"). (Tr. 15-16.) Therefore, in order to be entitled to POD and DIB, Whitaker must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.

2.    The claimant has not engaged in substantial gainful activity since January 3, 2019, the alleged onset date as amended (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: spinal stenosis of lumbar spine, annular tears at L3-4 and L4-5, with moderate bilateral neural foraminal narrowing and mild narrowing of the central canal, disc desiccation L3-4 through L5-S1, right sided sciatica with pain, osteoarthritis, fibromyalgia, myalgia, chronic pain syndrome, left side carpal tunnel syndrome, chronic fatigue syndrome (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20

CFR 404.1567(b) except she can frequently climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, occasionally stoop, kneel, crouch and crawl. She can occasionally use the bilateral lower extremities for operation of foot controls. She can occasionally use the left upper extremity for handling and fingering and frequently reach, handle and finger with the left upper extremity. The claimant must avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights. Additionally, she can perform work limited to well explained simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. She must not interact with the general public but can occasionally interact with coworkers and supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on June **, 1976 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 3, 2019, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-25.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir.

2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

23

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

As part of her first assignment of error, Whitaker challenges the RFC and the weight assigned to the opinion of treating psychiatrist Dr. Jahn. (Doc. No. 7 at 15-20.) Whitaker argues the "terse" three-sentence rationale for rejecting Dr. Jahn's opinion was insufficient even under the new regulations, and the ALJ failed to "address the progress notes of Dr. Jahn or the mental status examinations he conducted at each visit which support his opinion." (*Id.* at 16) (citations omitted). The ALJ also failed to "address the findings and evidence supporting Dr. Williams' opinion," which Whitaker argues was consistent with Dr. Jahn's opinion. (*Id.* at 16-17.)

The Commissioner responds that substantial evidence supports the ALJ's finding that Dr. Jahn's opinion was unpersuasive. (Doc. No. 8 at 14.) The Commissioner argues Whitaker "ignores most of the ALJ decision, instead limiting her argument to a single paragraph in which the ALJ, rather than torturously reciting prior discussions, synthesized the prior findings to create a succinct, legally sufficient analysis" and "the decision as a whole should be read with common sense." (*Id.* at 15.)

24

In reply, Whitaker argues the ALJ "reviewed only selected portions of Claimant's medical evidence as opposed to looking at the records holistically," and that when reading the ALJ's decision as a whole, "it is unsupported by substantial evidence, and constitutes harmful legal error."  (Doc. No. 9 at 1.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

25

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The ALJ did not discuss Whitaker's mental health records as part of the RFC analysis. (Tr. 21-24.) At Step Three, in considering the listings for mental impairments, the ALJ found as follows:

> The record discloses a history of substance dependence involving alcohol and opioids after the claimant was on opioids for several years resulting in addiction, per the claimant's report in April 2019 when she was on Suboxone under the care of her primary care physician (B-9F, 144).
>
> Substance abuse remains in sustained remission (Exhibit B-6F/6) and the claimant follows with her doctor on a regular basis (Exhibits B-11F, B-17F).

She treats with counseling and psychotropic medications under the care of a psychiatrist for a long-standing history of psychological conditions variously described as generalized anxiety disorder, social anxiety disorder, panic disorder, attention deficit hyperactivity disorder (ADHD), persistent depressive disorder, major depressive disorder and bipolar. Treatment notes from December 2018 reflect the claimant complained of poor memory that she attributed to fibromyalgia fog.  Her primary doctor diagnosed ADHD and her psychiatrist started her on medications that helped her focus and be more attentive. She took medications for depression, adjusted as needed, with positive results. She took Klonopin as needed finding she did not need it regularly. She told her psychiatrist that she had been rejected for disability benefits and was in the process of appealing the claim through an attorney who requested specific documentation indicating she was incapable of working due to her medical and psychiatric disorders (Exhibit B-9F/101, 118, 127). She was later upset because her psychiatrist had not issued the letter to help with her disability (Exhibit B-9F/124). In May 2019, the claimant was doing well with her medications and did not want any changes (Exhibit B-9F/135). During a mental health assessment at A Renewed Mind in September 2019, she reported her depression came in waves. Although medications helped, she did not want to go anywhere, did not like groups and did not drive. Loud or strange noises were bothersome. She slept too much with depression and not enough when anxious. She had difficulty with concentration, unable to pay attention for long (Exhibit B-6F). Later that year she started taking Subuxone and had to stop Adderall, noting a significant increase in difficulties with focus, concentration and short-term memory. Her psychiatrist then prescribed a trial of Atomoxetine, which helped despite some residual difficulty with focus and concentration (Exhibits B-16F/3, B-18F/8). She continues to see her therapist every two weeks (hearing testimony).

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04 (*depressive, bipolar and related disorders)* and12.06 (*anxiety and obsessive-compulsive disorders*). In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has moderate limitation. While there is no evidence of significant limitation in treatment notes, the claimant reports she forgets what she is told but can follow written instruction if allowed to ask questions (Exhibit B- 3E). Her psychiatrist reports no more than mild limitation in understanding information but greater in remembering or applying information (Exhibit B-15F). To accommodate for limitation in the ability to remember and apply information

27

to perform work activities, the undersigned provided restrictions in the complexity of work tasks and work-related decisions.

In interacting with others, the claimant has a moderate limitation. She lives with her husband and interacts with her parents and in-laws who come to visit and help. However, she reports having no friends and has conflicts with her brother whom she is afraid to confront (Exhibit B-3E and hearing testimony). She does not feel comfortable in large groups. She drives but does so locally because of anxiety (Exhibit B-6F). The residual functional capacity herein incorporates limitations in interaction with others in the workplace.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant consistently complains of difficulty concentrating and paying attention (Exhibits B-9F/142, B-3E and hearing testimony). Her doctor diagnosed ADHD and prescribed Adderall in 2018, which helped her focus and maintain better attention (Exhibit B-9F/101, 127). However, she had to stop taking it when she started Suboxone therapy and switched to Atomoxetine that helps but she has some residual symptoms (Exhibits (B-16F/3, 39, B-18F/8). The residual functional capacity assessed provides restrictions to accommodate for the claimant's ability to focus attention on work activities and stay on task at a sustained rate.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant asserts she is easily overwhelmed and cannot handle stress very well. Not being able to do things stresses her out. Changes in daily routine makes her nervous and upset, per her report (Exhibit 3E and hearing testimony). The residual function capacity herein provides for the claimant's limitation in regulating emotions, controlling behavior and responding to demands in the workplace by requiring a stable and predictable work setting.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

Furthermore, the severity of the claimant's mental impairments does not meet the C criteria. There are no two (2) years of medically documented history and evidence of both 1) medical treatment, mental health therapy, psychosocial support, or highly structured setting that is ongoing and that diminishes symptoms and signs of the mental disorder. 2) marginal adjustment, that is, minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life.

(*Id.* at 19-20.)

In the RFC analysis, in rejecting Dr. Jahn's opinion as unpersuasive, the ALJ found as follows:

> Psychiatrist David Jahn, MD, reported seeing the claimant on a monthly basis since December 2020. Dr. Jahn offered a mental assessment dated February 10, 2021, indicating the claimant's symptomatology is of such severity that she would be unable to complete even one normal workday due psychologically based symptoms and limitations mainly marked in degree, extreme in the ability to adapt in the workplace. The seriousness and persistence checked off in the form, with only a minimal residual capacity to adapt to changes and her reliance on ongoing treatment or highly structure setting is not supported by the record. This conclusive opinion is not persuasive as the record fails to reflect the intense treatment proposed in the form. Furthermore, the claimant is responsive to medication and treatment albeit residual symptoms accommodated for in the residual functional capacity herein as discussed above.

(*Id.* at 24.)

Nowhere in the ALJ's decision does he discuss the objective evidence supporting Whitaker's impairments in focus, concentration, and memory. In two visits in February 2021, Dr. Jahn found Whitaker could recall one of out three words in five minutes and that Whitaker was "[q]uite forgetful at least in part due to limited focus and concentration." (*Id.* at 1347, 1431.) Nor does the ALJ discuss two visits in the fall of 2020 where a case worker found Whitaker "[e]asily overwhelmed and confused." (*Id.* at 1127, 1304.) Instead, as evidenced by both the ALJ's discussion and the records cited at Step Three, the ALJ largely focused on Whitaker's subjective statements of her symptoms.

As set forth above, "[i]n rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). When relevant evidence is not mentioned, the Court cannot tell whether the ALJ discounted the evidence or overlooked it. *Shrader*, 2012 WL 5383120, at *6. A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of

fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)). Remand is required.

As this matter is already being remanded, in the interest of judicial economy, the Court declines to reach Whitaker's additional assignments of error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED AND REMANDED for further proceedings consistent with this opinion.

Date: November 22, 2022                     *s/ Jonathan Greenberg*
                                            Jonathan D. Greenberg
                                            United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**